**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION**

| | |
|---|---|
| XIAO SONG,<br><br>    **Plaintiff,**<br><br>v.<br><br>**THE BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA, JOSE CORDERO in his individual capacity, AND MARSHA DAVIS in her individual capacity,**<br><br>    **Defendants.** | **Civil Action No. 3:24-cv-00056-CDL** |

<u>**DEFENDANTS' BRIEF IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**</u>

COME NOW the Board of Regents of the University System of Georgia (the "Board"), and Jose Cordero and Marsha Davis, in their individual capacities (collectively "Defendants"), by and through counsel, the Attorney General of the State of Georgia, and file this Brief in Support of their Motion for Summary Judgment.

<u>**FACTS**</u>

Plaintiff Xiao Song is a tenured Professor in the Department of Epidemiology and Biostatistics at the University of Georgia's College of Public Health. (Doc. 1, Complaint at ¶ 14) Song identifies as Asian-American and of Chinese origin. (*Id.* at ¶¶ 13, 33) She reports to the Head of the Department, who at the time relevant to her claims was Jose Cordero. (Doc. 5, Answer at ¶ 8) Marsha Davis is Dean of the College and was in that position at the time period described in Song's Complaint. (Ex. A, Davis Depo. at 32)

1

Song was hired as an Assistant Professor in 2006, not long after the College was established, and she progressed through the ranks to Associate Professor with tenure in 2011, followed by her promotion to the highest rank of full Professor in 2019. (Doc. 1 at ¶ 12; Ex. B, Song Depo. at 16, 21; Ex. B-3, Promotion Letter; Ex. B-8, Second Promotion Letter)

Beginning in 2006 and each year after, Song entered into an academic year contract of employment with the Board, which contract provided her annual salary. (Ex. B, Song Depo. at 15) Starting salaries are based on a faculty member's rank and level of experience, within a budgeted salary range provided to the College by the University's human resources department. (Ex. A, Davis Depo. at 17-18) Song's starting salary was $70,000.00, and it increased over time; her salary for the 2024-2025 academic year was $111,917.00. (Ex. B, Song Depo. at 15; Ex. B-2, Hiring Letter; Ex. B-1, Annual Contracts)

Raises for faculty members are paid for with money provided by the University System of Georgia, at times that are in the System's sole discretion, together with guidelines as to the administration and distribution of the money. (Ex. D, Davis Decl. at ¶ 12) Types of raises provided for by the System include cost-of-living, compression and retention, and merit-based. (Ex. A, Davis Depo. at 110) In the period since academic year 2020-2021, there have been years in which the System did not approve or provide funds for raises. (Ex. D, Davis Decl. at ¶ 14) Per the System's guidelines, raises are sometimes available to all faculty, and other times available for only a portion of the faculty. (*Id.* at ¶ 14) In determining a merit-based raise for a faculty member, the College's dean and the department heads rank faculty according to the merits of their annual evaluations, using a three-year average, and the underlying teaching, scholarship, and service contributions of the faculty member. (Ex. A, Davis Depo. at 112-13)

As a full Professor in the College, Song's allocation of employment effort is 50 percent devoted to teaching, 45 percent devoted to research and scholarship, and 5 percent devoted to service. (Ex. B, Song Depo. at 37) The service component includes serving on committees at the Department, College, and University level. (*Id.* at 38) Faculty wishing to serve on University-level committees can self-nominate and be voted on by their peers. (Ex. D, Davis Decl. at ¶¶ 5-6) Song served on a number of committees, at least one for each level, including Department-level committees relating to promotion and tenure and third-year review. (Ex. B, Song Depo. at 38-39, 44-45, 65)

In August of 2020, Song, together with Professors Ming Zhang and Hanwen Huang of the Department, claimed that fellow professor Andrea Swartzendruber submitted false information in her dossier as a candidate for promotion and tenure. (Complaint, Doc. 1 at ¶ 21; Ex. B, Song Depo. at 52, 54) Song apparently did not get an invitation to the first committee meeting regarding Swartzendruber's application, but she attended the second meeting, where she claimed there were falsehoods in the dossier. (Ex. B-9, Song Interrogatory Responses at 7; Doc. 1 at ¶ 21) Department Head Cordero investigated the claims made by Song. (Ex. C, Cordero Depo. at 66-67; Ex. E, Letter to Committee) On September 15, 2020, Cordero issued a letter to the members of the Swartzendruber Promotion and Tenure Committee, addressing his findings relating to each claim of alleged falsehood in the dossier. (Ex. E, Letter to Committee) Song, Zhang, and Huang, displeased with Cordero's findings, started a letter-writing campaign to the University Provost's office, complaining about the Swartzendruber dossier, Cordero's response to their accusations, and Cordero's management of the Department generally. (Exs. F, G, H, and I) The professors submitted four lengthy letters over the course of a year, but none of their writings mentioned that their complaints were related to race, national origin, or discrimination. (*Id.*)

In late 2021, the University Provost's office appointed a committee of faculty members from outside the College to review Song and company's complaints. (Ex. B-10, Review Committee Report) The committee found that the promotion and tenure process for Swartzendruber was conducted appropriately; that there was no evidence of favoritism or lack of fairness in the Department; and that Song, Zhang, and Huang had engaged in disruptive behavior—including blaming others for problems, challenging and resisting authority, engaging in conflicts with faculty and students, and expressing entitlement and that rules did not apply to them—that had a negative impact on the morale and collegiality in the Department. (*Id.* at 1-3)

Faculty in the College are subject to annual employment evaluations, conducted by their department heads in consultation with the faculty member. (Ex. A, Davis Depo. at 47; Ex. D, Davis Decl. at ¶ 7) Annual evaluations indicate whether a faculty member is making satisfactory progress toward the next level of review appropriate to their rank. (Ex. D, Davis Decl. at ¶ 8) Satisfactory progress in any given year does not guarantee that the faculty member will be successful in proceeding to the next step, and unsatisfactory progress in a given year does not predetermine the employee will not be successful in promotion, tenure, or post-tenure review. (*Id.* at ¶ 9) Before 2023, faculty were rated in their annual evaluations on the three areas of effort (teaching, scholarship, and service) as either below expectations, meets expectations, or exceeds expectations for each area, as well as an overall rating. (Ex. A, Davis Depo. at 47; Ex. C, Cordero Depo. at 12) The Department adopted and applied new annual evaluation criteria in 2023, per University System of Georgia requirements, scoring faculty on a five-point scale. (Ex. D, Davis Decl. at ¶ 10-11; Ex. B, Song Depo. at 117, 119)

The first step of the evaluation process is a self-report by the faculty member, then the department head uses a University database to confirm the member's publications and professional

activities, followed by a meeting of the faculty member and department head. (Ex. C, Cordero Depo. at 12) Cordero conducted Song's evaluations for the relevant time period. (Ex. B, Song Depo. at 62-63) He rated her as meeting expectations in all three areas of effort from 2016 to 2020. (Ex. B, Song Depo. at 64, 66-68, 71) For her 2021 evaluation meeting, Song and Cordero were joined by Senior Associate Dean Timothy Heckman. (Ex. B, Song Depo. at 94-95; Ex. A-2, Heckman Email) Cordero rated Song's 2021 scholarship effort below expectations because she had not developed a sustained programmatic line of research that warranted significant external funding, nor had she obtained external funding to support doctoral candidates and postdoctoral research fellows. (Ex. B-17, 2021 Evaluation at 3) He rated her as meeting expectations for teaching and service and meeting expectations with comments for improvement overall. (*Id.*) Song vehemently disagreed with Cordero's findings as to her scholarship, and she repeatedly yelled at and interrupted Cordero in the meeting, to such an extent that Heckman commemorated her behavior in writing. (Ex. B-22, Song Response; Ex. A-2, Heckman Email) Dean Marsha Davis, after learning of Song's behavior, investigated Song's complaints about the evaluation, found no basis to change it, and wrote Song a letter of counseling regarding her conduct. (Ex. A, Davis Depo. at 107-08; Ex. B-19, Letter of Counseling)

For 2022, Cordero again rated Song's scholarship effort below expectations for a full Professor because she did not have sustained funding that supported her research, including support for doctoral students and postdoctoral students. (Ex. B-20, 2022 Evaluation at 3) He rated her as meeting expectations for teaching and service and meeting expectations with comments for improvement overall. (*Id.*) Song objected again, claiming that he was using promotion and tenure criteria to evaluate her funding levels, and raised her objections in writing and orally during the annual evaluation meeting. (Ex. B, Song Depo. at 106-07; Ex. B-23, Song Response)

Using the newly adopted evaluation criteria for Song's 2023 evaluation, Cordero rated her as "3 – Meets Expectations" in all three categories of effort and "3 – Meets Expectations" in overall performance. (Ex. B-21, 2023 Evaluation) Song objected to this evaluation too, claiming she should have been rated as exceeding expectations for scholarship. (Ex. B-24, Song Response)

Song underwent her five-year post-tenure review process in March of 2025 and was notified by current Department Head Ye Shen that she successfully completed the review. (Ex. D, Davis Decl. at ¶ 15-17) Song did not object to the findings of the committee or Department Head Shen. (*Id.* at ¶ 18) She remains employed as a tenured Professor in the College. (Doc. 1 at ¶ 14)

Song filed an EEOC charge of discrimination on July 25, 2023, and filed the Complaint in this case on June 20, 2024. (Ex. J, EEOC Charge; Doc. 1)

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate because the pleadings, depositions, answers to interrogatories, and documents on file show there is no genuine issue as to any material fact and that Defendants are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), (c)(1)(A). A fact is material if it is relevant or necessary to the outcome of the suit, and factual dispute is genuine if the evidence would allow a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505 (1986).

## ARGUMENT

There is no genuine dispute of material fact regarding whether Defendants engaged any employment action against Song because of her race or national origin. Song has no evidence from which a reasonable jury could conclude that she suffered any adverse employment action in the discrimination or retaliation context; that she engaged in protected activity; or that any alleged protected activity was causally related to an adverse action. Song's discrimination claims also fail

6

for lack of a similarly situated comparator; because she cannot show any action taken was for a discriminatory motive; and because she cannot show pretext. In addition, Cordero and Davis are entitled to qualified immunity on her 42 U.S.C. § 1981 claims.

## I.    Song's Claims

Song brings claims for race and national origin discrimination under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e *et seq.*, alleging that she was deprived of an employment opportunity and was "otherwise adversely affected" as an employee because of her race and national origin. *See* Complaint, Counts I and II, Doc. 1 at 9-11. She also alleges race discrimination against Cordero and Davis under 42 U.S.C. § 1981 through § 1983[1] by refusing her a teaching assistant, extensions, and "otherwise barring her from opportunities afforded to her non-Asian counterparts." *Id.*, Count III, at 11. She further claims retaliation by Cordero and Davis under Section 1981. *Id.*, Count IV, at 13-14.

Song has no direct evidence of discrimination and only relies on circumstantial evidence. A plaintiff relying on circumstantial evidence to prove discrimination may use the *McDonnell Douglas* burden-shifting framework to establish her *prima facie* case by showing that (1) she belongs to a protected class, (2) she was subjected to an adverse employment action, (3) she was qualified to perform the job in question, and (4) her employer treated similarly situated employees outside her class more favorably. *Lewis v. City of Union City*, 918 F.3d 1213, 1220-21 (11th Cir. 2019). As an alternative to the *McDonnell Douglas* structure, a plaintiff can show a convincing mosaic of circumstantial evidence "that demonstrates, among other things, (1) suspicious timing, ambiguous statements, or other information from which discriminatory intent may be inferred, (2)

---

[1] Although Section 1981 creates the right to be free from racial discrimination in employment contracts, Section 1983 is the exclusive damages remedy for violations of Section 1981 by a government actor. *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 735 (1989).

systematically better treatment of similarly situated employees, and (3) pretext." *Jenkins*, 26 F.4th at 1250. Regardless of the framework used, ultimately it is Song's burden to bring forth enough evidence to show that she suffered an adverse employment action and that the reason for that action was illegal discrimination. *Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 941 (11th Cir. 2023).

## II.    Claims of Race and National Origin Discrimination (Counts I, II, and III)

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race…or national origin." 42 U.S.C. § 2000e-2(a)(1). To prove race or national origin discrimination under Title VII or 42 U.S.C. § 1981, a plaintiff must show that her employer took an adverse employment against her because of her race or national origin. *Jenkins v. Nell*, 26 F.4th 1243, 1249 (11th Cir. 2022) (elements of a discrimination claim are the same under both statutes); *McQueen v. Ala. DOT*, 769 Fed. App'x. 816, 821 (11th Cir. 2019) (discrimination claims brought under § 1981 subject to same standards of proof and use the same analytical framework as intentional discrimination claims brought under Title VII).

### A.    To be adverse, the employer's actions must cause a disadvantageous change to the terms, conditions, or privileges of employment.

An adverse employment action by Defendants is a necessary element of Song's employment discrimination claims. In a Title VII case, an adverse employment action is "not only an element of the *prima facie* case, but also of the claim itself." *Holland v. Gee*, 677 F.3d 1047, 1056 (11th Cir. 2012). A plaintiff who fails to prove that she suffered an adverse employment action "will be unable to prove that she was unlawfully discriminated against." *Tynes*, 88 F.4th at 946.

In order to prove adverse action under her Title VII discrimination claim, Song must show that her employer "brought about some disadvantageous change"—that is, some harm respecting an identifiable term or condition of her job. *Muldrow v. City of St. Louis*, 601 U.S. 346, 354, 144 S. Ct. 967 (2024). Song does not allege an ultimate employment decision, such as termination, failure to hire, or demotion. Therefore, she must show conduct by Defendants that changed, in a disadvantageous way, her compensation, terms, conditions, or privileges of employment; deprived her of employment opportunities; or adversely affected her status as an employee. *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008). Simply put, Defendants' actions "must have left [Song] worse off." *Muldrow* at 359. *See also Lukie v. Metlife Grp., Inc.*, 2024 U.S. App. LEXIS 25629 (11th Cir. 2024) and *Shed v. Univ. of S. Fla. Bd. of Trs.*, 2025 U.S. App. LEXIS 13213 (11th Cir. May 30, 2025) (applying *Muldrow* to Title VII discrimination claims).

**B.    Defendants took no adverse employment action against Song.**

Song has not shown any disadvantageous change to the terms, conditions, or privileges of her employment giving rise to a claim of adverse action. First, she suffered no ultimate employment action such as loss of pay, position, duties, or benefits. *See Crawford*, 529 F.3d at 970. There is no dispute that Song remains a tenured full Professor in the College. Second, the actions she complains of—performance reviews where she met expectations, a missing invitation to faculty meeting, a letter of counseling, and certain committee appointments—had no effect on her employment status. She has shown no change to the terms, conditions, or privileges of her employment as a full Professor with tenure leaving her worse off than before.

### 1.  *Annual Evaluations*

Song's primary focus is on her annual performance evaluations from Cordero. But her claim fails where her overall ratings were not negative, and she did not realize any actual loss from

the evaluations. Courts in this Circuit are clear that "[n]egative performance evaluations, standing alone, do not constitute adverse employment action sufficient to satisfy the second element of a *prima facie* case of retaliation under the ADA." *Lucas v. W. W. Grainger, Inc.,* 257 F.3d 1249, 1261 (11th Cir. 2001) (negative performance evaluations that were not relied upon by employer for an employment decision did not result in any effect on plaintiff's employment, thus the evaluations were not adverse actions). *See also Brown v. Snow*, 440 F.3d 1259, 1265 (11th Cir. 2006) ("a lower score on [a] performance evaluation, by itself, is not actionable under Title VII unless [Plaintiff] can establish that the lower score led to a more tangible form of adverse action, such as ineligibility for promotional opportunities"); *Anderson v. UPS*, 248 Fed. Appx. 97, 100 (11th Cir. 2007) (no evidence that low performance evaluations by themselves qualified as adverse employment actions, particularly where they were only a contributing factor in a multi-step process to determine employee's eligibility for certain benefits or promotions). *See generally Davis v. Town of Lake Park*, 245 F.3d 1232, 1241 (11th Cir. 2001) ("[C]ourts are wisely reluctant to treat job performance memoranda as actionable under Title VII where they do not trigger any more tangible form of adverse action such as a loss in benefits, ineligibility for promotional opportunities, or more formal discipline.") (employee did not suffer any tangible injury from two negative job performance memoranda).

At the outset, Song's performance reviews are not properly categorized as "negative." There was not a single occasion where she received an *overall* evaluation of "below expectations." The Eleventh Circuit has held that a "fully successful performance review (rather than 'exceptional')" does not constitute an adverse action. *McQueen v. Ala. DOT*, 769 Fed. App'x. 816, 824 (11th Cir. 2019), citing *Trask v. Sec'y, Dep't of Veterans Affairs*, 822 F.3d 1179, 1191 (11th Cir. 2016). In the single subcategory of scholarship, Cordero twice rated Song as below

expectations, with explanations for his findings and comments for improvement in that area. While Song argued vehemently with the department head about his findings, the simple fact of her disagreement is not actionable; the "protections of Title VII simply do not extend to everything that makes an employee unhappy," including employer feedback and direction. *Davis* at 1242.

Moreover, Song has not experienced any resulting change or loss—to her compensation, to her benefits, to the conditions of her continued employment—from the evaluations. Without evidence that annual performance reviews directly resulted in injury to her, the evaluations do not give rise to a claim of adverse action. Song alleges she received "lower than average" raises but offers no proof that the raises were tied to the evaluations. Only a poor performance evaluation that "directly disentitles an employee to a raise of any significance is an adverse employment action." *Gillis v. Ga. Dep't of Corr.*, 400 F.3d 883, 888 (11th Cir. 2005) (noting that denial of *de minimus* raises are not adverse). *Contrast Crawford*, 529 F.3d at 971 (employee's poor evaluation and her compensation were "inextricably intertwined" where there was direct evidence that employee had not received merit pay increase due to the negative evaluation). She also hints at the idea that the evaluations *could* affect her post-tenure review, but only if she did *not* receive a rating of "meets expectations." That is simply not the evidence before the Court because Song's post-tenure review was successful.[2]

---

[2] At best, Song tries to articulate a claim for anticipated loss if the evaluations had any effect on her post-tenure review in the future. *See* Complaint, Doc. 1 at ¶ 26. But the asserted impact "cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment." *Davis* at 1239. Song's speculation that her evaluations could possibly influence her post-tenure review process at some unknown time in the future is not a present economic injury. A negative evaluation "will rarely, if ever, become actionable merely because the employee comes forward with evidence that his future prospects have been or will be hindered as a result." *Id.* at 1243. *See Stavropoulos v. Firestone*, 361 F.3d 610 (11th Cir. 2004) (despite votes not to renew her contract, with no actual lapse in employment, professor had not shown adverse action); *see also Crawford v. Carroll*, 529 F.3d 961, 974-75 (11th Cir. 2008), characterizing the rule in *Stavropoulos* as "anticipated loss."

### 2. *Letter of Counseling*

To the extent that Song relies upon the letter of counseling Davis issued after Song's 2021 meeting with Cordero and Heckman, Complaint, Doc. 1 at ¶ 27, it likewise resulted in no disadvantageous change to Song. The Court in *Davis v. Town of Lake Park* addressed the issue of counseling letters. 245 F.3d 1232 (11th Cir. 2001). There, police officer Davis had two corrective job performance memos placed in his personnel file: one regarding his failure to comply with certain paperwork requirements, the other criticizing his job performance and "identif[ying] several specific instances of unacceptable conduct" and warning that continued conduct may result in additional action by the department. *Id.* at 1234-36. However, Davis did not suffer any reduction in salary, loss of benefits, denial of promotions, workplace reassignment, transfer, or change in permanent job title as a result of the letters. *Id.* at 1236. The Court was "wisely reluctant to treat job performance memoranda as actionable under Title VII where they do not trigger any more tangible form of adverse action such as a loss in benefits, ineligibility for promotional opportunities, or more formal discipline." *Id.* at 1241-42 (written counseling was not adverse employment action under Title VII anti-discrimination clause where employee did not produce any evidence that he suffered any tangible consequence from the writings), citing several decisions from other circuits holding that counseling memoranda do not constitute adverse actions. Even a warning in a counseling letter that one's job is in jeopardy (which does not exist in Song's letter) would not amount to an adverse employment action. *See id.* at 1236; *see also Howard v. Walgreen Co.*, 605 F.3d 1239, 1245 (11th Cir. 2010) (warnings that the plaintiff's employment was in danger were not adverse actions where no change in terms or conditions of job resulted from the warning).

### 3. *Other Actions*

As to the other conduct of which Song complains, inadvertent exclusion from a single faculty meeting is not a meaningful denial of the privileges of her employment. Such "[t]rivial slights are not actionable." *Monaghan v. Worldpay US, Inc.*, 955 F.3d 855, 860 (11th Cir. 2020). *See also Akins v. Fulton County*, 420 F.3d 1293 (11th Cir. 2005) (exclusion from meetings was not an adverse employment action). Nor does appointment to fewer committees than one might desire constitute a denial of the privileges of employment, particularly given that Song served on committees at every level (University, College, and Department) and could have nominated herself to serve on more, with such nomination to be voted on by her faculty peers. Committee service is part of the service-effort area of her job distribution, and she never received less than "meets expectations" on her evaluations for this area by Cordero.

Though not alleged in her Complaint or her EEOC charge of discrimination, Song claims as an adverse action in her interrogatory responses that she received "lower than the average University raises." (Ex. B-9 at 14) Song has no evidence to support this claim. Raises at the University take many forms, including cost-of-living, compression and retention, and merit-based. Raises are provided by the University System at times that are in the System's sole discretion. Since academic year 2020-2021, there have been years in which no System-approved raises were offered. Song admits she received cost-of-living raises and merit-based raises. There is no evidence that she was entitled to other merit-based raises or was denied a merit-based raise, or that the basis of any alleged denial was discrimination. She vaguely alleges only that she received a lesser raise than others across the University. A lower-than-average raise, even if shown, is not an outright denial. *See Gillis v. Ga. Dep't of Corr.*, 400 F.3d 883, 888 (11th Cir. 2005). More importantly, there is no evidence to suggest that Song did not receive additional merit-based raises after the

2020-2021 academic year contract because of her performance evaluations or intentional discrimination by Defendants.[3] Simply put, there is not enough here to find that Song's raises amounted to adverse employment actions.[4]

Song has not and cannot show that she is worse off due to any of Defendants' conduct. There is no evidence to support that "meets expectations" performance reviews, a missed committee meeting, a letter of counseling, committee appointments, and "less than average" raises resulted in disadvantageous changes in the terms, conditions, or privileges of her employment. Song cannot meet her burden of proving that she experienced any adverse employment actions for Title VII or § 1981 purposes, and a plaintiff who fails to prove that she suffered an adverse employment action "will be unable to prove that she was unlawfully discriminated against." *Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 946 (11th Cir. 2023). Summary judgment should issue to Defendants on Song's discrimination claims.[5]

### C.    Song's discrimination claims additionally fail for lack of a comparator.

Song's claim also should not survive because she has not presented a comparator. To make a *prima facie* claim under Eleventh Circuit precedent, Song must show that she and her

---

[3] Song, in alleging that she received lower-than-average raises, did not identify a comparator in her interrogatory responses. At her deposition, she claimed that a white professor in the Department, Kevin Dobbin, had a larger salary than her. However, Song presents no direct or circumstantial evidence to support a suggestion that Dobbin's salary was higher than hers because of discrimination, retaliation, or any adverse action against her by the Defendants.

[4] Though alleged in Count IV of her Complaint, absolutely nothing in Song's deposition testimony, answers to interrogatories, or document production claims, reasserts, or supports any allegations that she was denied a teaching assistant, denied extensions, or denied course buyouts. *See* Complaint, Doc. 1 at ¶¶ 47, 56. Upon information and belief, this is a reference to the claims fo Ming Zhang.

[5] Because Song's discrimination claim against the Board fails, her § 1981 claims asserted against the individual defendants based upon the same underlying facts must also fail. *McQueen v. Ala. DOT*, 769 Fed. App'x. 816, 821 (11th Cir. 2019), citing *Quigg v. Thomas Cty. Sch. Dist.*, 814 F.3d 1227, 1235 (11th Cir. 2016).

comparators are "similarly situated in all material respects." *Lewis v. City of Union City*, 918 F.3d 1213, 1224 (11th Cir. 2019). Similarly situated comparators engage in the same basic conduct or misconduct as the employee and share her employment history. *Id.* at 1227-28. As for the annual evaluations, there is no evidence of similarly situated non-Asian full Professors who were treated more favorably than Song. When asked to identify comparators, Song stated without support that three white faculty members received positive performance reviews despite their "failure to meet the metrics" (Ex. B-9 at 7), but offers no evidence of their performance metrics beyond her bare assertion. Because Song fails to show the existence of a similarly situated employee and no other evidence of discrimination is present, summary judgment is appropriate. *See McQueen v. Ala. DOT*, 769 Fed. App'x. 816, 822 (11th Cir. 2019).

> **D.    Song cannot show that any action taken against her was for a discriminatory motive, or that the explanation for any action was pretext.**

Even if Song could establish a *prima facie* case of discrimination, none of the actions she complains of were based on her race or national origin. To the extent that Defendants acted, they did so for legitimate, non-discriminatory reasons. The burden shifts to Song to introduce evidence showing these reasons are mere pretext. *Lewis*, 918 F.3d at 1221. There is no evidence that the reasons provided are false, nor can Song show that discrimination was a motivating factor or but-for cause of the alleged actions. *See Ossmann v. Meredith Corp.*, 82 F.4th 1007, 1014 (11th Cir. 2023). Defendants are entitled to summary judgment on these claims.

## III.    Claim of Retaliation (Count IV)

Section 1981 prohibits retaliation against public employees who oppose racial discrimination. *Bryant v. Jones*, 575 F.3d 1281, 1300-01 (11th Cir. 2009). Retaliation claims under Section 1981 are analyzed under the same framework as Title VII retaliation claims. *Gogel v. Kia*

*Motors Mfg. of Ga.*, 967 F.3d 1121, 1134 (11th Cir. 2020), citing *CBOCS W., Inc., v. Humphries*, 553 U.S. 442, 452-57, 128 S. Ct. 1951 (2008), and *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998). To make a *prima facie* case of retaliation under § 1981, Song must prove she engaged in protected activity, she suffered an adverse action, and a causal relationship existed between the two events—*i.e.*, that race was the but-for cause of the challenged employment action. *Bryant*, 575 F.3d at 1307; *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 341 (2020). "Importantly, throughout this entire process, the ultimate burden of persuasion remains on the employee." *Gogel* at 1135.

### A. Song did not engage in protected activity.

On the initial question of protected activity, Song cannot meet her burden. An employee engages in protected activity if she opposes an employment practice based on a good faith belief, objectively reasonable in light of the facts and circumstances, that her employer was engaged in employment practices that violated Section 1981. *Bryant v. U.S. Steel Corp.*, 428 Fed. App'x. 895, 898 (11th Cir. 2011). In making her complaint, it is not enough that the employee opposed unfairness; at a minimum, she "must communicate to her employer her belief that discrimination was occurring...[i]t is not enough to simply complain in a racially neutral way about an employer's practices, and then expect the employer to speculate as to whether such complaints may be motivated by an employee's subjective and undisclosed belief that the employer was engaged in race discrimination." *Wehunt v. R. W. Page Corp.*, 352 F. Supp. 2d 1342, 1358, 4:03-CV-30-CDL (Dec. 15, 2004) (employee did not engage in protected activity where her complaints lacked mention of discrimination). *See also Kavianpour v. Bd. of Regents of the Univ. Sys. of Ga.*, 1:20-cv-00152-MLB-RGV, 2018 U.S. Dist. LEXIS 244055, 2021 WL 2638999, at *24 (N.D. Ga. Jan. 28, 2021), adopted as modified by 2021 U.S. Dist. LEXIS 126686, 2021 WL 2635854, at *13

16

(N.D. Ga. Mar. 29, 2021) ("The onus is on the speaker to clarify to the employer that she is complaining of unfair treatment due to her membership in a protected class[,] and that she is not complaining merely of unfair treatment generally.").

There is no evidence that Song engaged in protected activity. Only once in Song's many submissions to the provost (formulated together with Ming Zhang and Hanwen Huang) is there any mention of Song's race—stating that both Song and Zhang "are Asian females"—and no references to national origin. She made in-meeting complaints to Cordero about Swartzendruber's dossier, and written complaints to the provost about Cordero's handling of Swartzendruber's promotion and tenure and his overall management of the Department. But in both instances, she never complained about discrimination against her on the basis of race or origin. Grievances that amount to personal complaints of unfairness, a disagreement with management style, and injustice generally are not protected activity supporting a § 1981 retaliation claim. There are no references to discrimination by Cordero, to Cordero or Davis or other faculty members' race or origin, or retaliatory conduct based on race or origin that would put Defendants on notice that she was engaging in protected activity. Where Song was not engaging in protected conduct, there can be no retaliation.

**B. Song cannot show a causal connection between alleged protected activity and any adverse action.**

With regard to her retaliation claim; Song's Complaint is silent as to a specific retaliatory adverse action. *See* Doc. 1 at 13. However, in her responses to interrogatories, Song states that her annual evaluations from Cordero were retaliatory because they occurred after her complaints to the provost. (Ex. B-9 at 11) For the reasons stated in Part A, *supra*, the annual evaluations are not

materially adverse actions[6] that would have dissuaded a reasonable person from making a charge of discrimination. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).

Even if Song faced an adverse action, the facts of this case dispel any argument that protected conduct of opposing racial discrimination was the but-for cause of the action. She must prove that had she not complained to Cordero and the provost, she would not have suffered an adverse action. In her deposition, Song relied on temporal proximity to support her retaliation claim, pointing to the time period between the Review Committee's report and her annual evaluation meeting in 2022 as evidence of causation. Although close temporal proximity can establish the causation element of retaliation, "mere temporal proximity, without more, must be very close." *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007). Absent other evidence, Song's claim of retaliation fails as a matter of law where there is a substantial delay between the protected activity and the adverse action. *Id.* (three-month period not temporally close enough). The first allegedly adverse action of which Song complains—no invitation to the initial

---

[6] In *Ming Zhang v. Board of Regents, et al.*, a companion case to the instant one, this Court held:

> At the time of the events giving rise to this action,…[i]t was also clearly established that § 1981 prohibits a supervisor from taking a "materially adverse action" against an employee because the employee opposed racial discrimination. *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1277 (11th Cir. 2008) (citing *Burlington N.*, 548 U.S. at 68). At the time of Defendants' alleged conduct, a "materially adverse action" was one that likely would have dissuaded a reasonable person from making a charge of discrimination. *Burlington N.*, 548 U.S. at 68.
> FN5: In *Muldrow*, the Supreme Court abrogated the "serious and material change" standard and concluded that an employee must show "some harm respecting an identifiable term or condition of employment," emphasizing that there is no heightened bar and that discrimination occurs when a person is treated worse based on a protected trait. *Muldrow*, 601 U.S. at 355 (explaining the standard in the Title VII context). But *Muldrow* was not decided until after the events giving rise to this action occurred, so it could not provide clear notice of this standard to Cordero and Davis.

Order, Doc. 27, 3:23-cv-00149-CDL (August 26, 2024).

Swartzendruber meeting—occurred *before* any alleged protected activity. Her annual evaluation in March of 2022, and Davis's letter of counseling regarding her conduct during the evaluation, occurred more than 18 months after her first provost letter and 6 months after her last provost letter—far too long to establish causation. *See, e.g., Ivey v. Crestwood Med. Ctr.*, 2024 U.S. App. LEXIS 7059, *5 (11th Cir. 2024) (three-month gap between protected activity and termination was not sufficient temporal proximity to create triable issue on causation); *Lukie v. Metlife Grp., Inc.*, 2024 U.S. App. LEXIS 25629, *18 (11th Cir. 2024) (employee's complaints filed one and two years before adverse action did not establish close temporal proximity). And in that 6- to 18-month period, the Review Committee's findings indicate that Song spent "a significant amount of time" on her complaints and less time "productively in the pursuit of academic endeavors." (Ex. B-10 at 1)

## IV.    Qualified Immunity Bars the Claims against Cordero and Davis.

Cordero and Davis are entitled to qualified immunity on Song's § 1981 claims. Qualified immunity protects government officials performing discretionary functions from civil damages as long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Sherrod v. Johnson*, 667 F.3d 1359, 1363 (11th Cir. 2012), citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727 (1982). There is no dispute that Cordero and Davis were acting in their discretionary authority when they took the challenged employment actions. The burden shifts to Song to show that they violated her clearly established constitutional right. *Bryant v. Jones*, 575 F.3d 1281, 1300 (11th Cir. 2009). For a constitutional right to be clearly established, it must be "so clear that every objectively reasonable official must understand that what the defendant, in the context of the circumstances of the case, is doing clearly violates the right." *Snider v. Jefferson State Cmty. College*, 344 F.3d 1325, 1328

(11th Cir. 2003). The unlawfulness "must be apparent: plain, clear, obvious" in light of preexisting law. *Id.* For the reasons detailed above, Song's constitutional rights were not violated at all. Even if a constitutional violation occurred, under the facts of this case, the violation was not clear enough to be considered a violation of clearly established law. Davis and Cordero are entitled to qualified immunity and summary judgment on these claims.

## CONCLUSION

For the reasons stated above, Defendants respectfully request that their Motion for Summary Judgment be granted, and that the Court enter an order dismissing with prejudice all of Plaintiff's claims against them.

Respectfully submitted, this 11th day of July, 2025.

CHRISTOPHER M. CARR          112505
Attorney General

BRYAN K. WEBB               743580
Deputy Attorney General

KATHERINE P. STOFF              536807
Senior Assistant Attorney General

**s/Devin Hartness Smith**
DEVIN HARTNESS SMITH         918980
Special Assistant Attorney General

PLEASE SERVE:

DEVIN HARTNESS SMITH
Special Assistant Attorney General
Cook & Tolley LLP
304 East Washington Street
Athens, Georgia 30601
Telephone: (706) 549-6111
Facsimile: (706) 548-0956
Email: devinhsmith@cooktolley.com
*Counsel for Defendants*

20

## <u>CERTIFICATE OF SERVICE</u>

I certify that I have this day served Defendants' Brief in Support of Motion for Summary

Judgment upon counsel for Plaintiff via electronic mail, as follows:

Kate A. Cantolina
Kira Fonteneau
The Workers' Firm LLC
P.O. Box 530092
Atlanta, GA 30353
(404) 382-9660
kate@theworkersfirm.com
kira@theworkersfirm.com

This 11th day of July, 2025.

<u>s/Devin Hartness Smith</u>
DEVIN HARTNESS SMITH          918980
Special Assistant Attorney General