IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

XIAO SONG,                        *

    Plaintiff,                   *

vs.                              *

THE BOARD OF REGENTS OF THE       *       CASE NO. 3:24-CV-56 (CDL)
UNIVERSITY SYSTEM OF GEORGIA,
*et al.*,                          *

    Defendants.                  *

_____

O R D E R

Xiao Song is a professor at the University of Georgia's College of Public Health. She is an Asian woman of Chinese origin. Song claims that after she complained about perceived preferential treatment of a white tenure candidate's dossier, her supervisors retaliated against her by giving her poor performance reviews and issuing her a letter of counseling. Song also contends that she was discriminated against based on her race and national origin because she was paid less than and received less favorable performance reviews than white employees. Song asserts retaliation claims and race and national origin discrimination claims against the Board of Regents of the University System of Georgia under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* She also asserts 42 U.S.C. § 1981 race discrimination and retaliation claims against two of her

supervisors, Jose Cordero and Marsha Davis.    Presently pending before the Court is Defendants' summary judgment motion.    For the reasons set forth below, the Court grants the motion (ECF No. 14).

## SUMMARY JUDGMENT STANDARD

Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).    In determining whether a *genuine* dispute of *material* fact exists to defeat a motion for summary judgment, the evidence is viewed in the light most favorable to the party opposing summary judgment, drawing all justifiable inferences in the opposing party's favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).    A fact is *material* if it is relevant or necessary to the outcome of the suit.  *Id.* at 248.  A factual dispute is *genuine* if the evidence would allow a reasonable jury to return a verdict for the nonmoving party.    *Id.*

## FACTUAL BACKGROUND

Xiao Song is a tenured full professor at the University of Georgia, where she works in the College of Public Health's Department of Epidemiology and Biostatistics.  She is a Chinese citizen of Chinese origin, and she is a permanent resident of the United States.  Song began working at UGA in 2006 as an assistant professor in the College of Public Health.  She was promoted to associate professor with tenure in 2011, and she was promoted to

the highest rank of full professor in 2019. From 2015 to 2024, Song's direct supervisor was Jose Cordero. During that time, Cordero was head of the Department of Epidemiology and Biostatistics. Marsha Davis is the dean of the College of Public Health and was Cordero's supervisor during the relevant timeframe.

In 2020, Song served on the promotion and tenure committee for Andrea Swartzendruber, an assistant professor of epidemiology. Song did not receive an electronic calendar invitation to a July 2020 committee meeting regarding a pre-evaluation of Swartzendruber's tenure application. Song did receive notification of an August 2020 committee meeting, which she attended. During that meeting, Song and another professor, Ming Zhang, raised issues with Swartzendruber's tenure application, including their contention that the application contained false information about Swartzendruber's external funding. But the committee, led by Cordero, voted on Swartzendruber's application "without the benefit of having confirmatory data about each of the issues." Defs.' Mot. Summ. J. Ex. E, Letter from J. Cordero to Committee 1 (Sep. 15, 2020), ECF No. 16-3. Cordero asserts that after the vote, he investigated the concerns raised by Song and Zhang, concluded that Swartzendruber had not made any material misrepresentations in her dossier, and issued a letter regarding his findings to the Swartzendruber tenure committee on September 15, 2020. *Id.*

Dissatisfied with Cordero's response, Song and Zhang, along with another colleague named Hanwen Huang, submitted a written complaint to Elizabeth Weeks, UGA's Associate Provost for Academic Affairs. The authors did not identify themselves in the letter but signed it "A Group of Faculty in Department of Epidemiology and Biostatistics." Defs.' Mot. Summ. J. Ex. F, Letter from Group of Faculty to E. Weeks (Sep. 24, 2020), ECF No. 16-4. The letter stated that "faculty A" and "faculty B" were excluded from the preliminary meeting about Swartzendruber, it raised concerns about Swartzendruber's representations regarding her external funding and teaching load, it accused Cordero of placing a retaliatory letter in Zhang's personnel record, and it raised concerns about Cordero's leadership style and lack of professionalism. *Id.* at 1-5. The letter did not expressly mention race, national origin, or discrimination. It did accuse Cordero of retaliating "against faculty who raised different opinions" during the August 27 meeting. *Id.* at 3.

On October 4, 2020, Song, Zhang, and Huang submitted another letter from the "Group of Faculty Members at the Department of Epidemiology and Biostatistics," this time to Senior Vice President for Academic Affairs and Provost Jack Hu. Defs.' Mot. Summ. J. Ex. G, Letter from Group of Faculty to J. Hu (Oct. 4, 2020), ECF No. 16-5. The authors did not identify themselves in the letter. The letter accused Cordero of manipulating the

promotion and tenure process for Swartzendruber, and it expressed concerns about perceived unfairness in teaching load, annual review criteria, and allocation of departmental funds. *Id.* at 2-3. Specifically, the authors accused Cordero of treating Ye Shen, a biostatistics faculty member, more favorably than other faculty members. *Id.* The letter did not expressly mention race, national origin, or discrimination. It did accuse Cordero of retaliating "against faculty members who raised questions" during the August 27 meeting, of placing a retaliatory letter in Zhang's personnel record, and of retaliating against unspecified faculty members for questioning his methods. *Id.* at 4-5.

Nearly a year later, in September 2021, Song, Zhang, and Huang wrote another letter to Hu, this time signing their names. Defs.' Mot. Summ. J. Ex. H, Letter from X. Song *et al.* to J. Hu (Sep. 9, 2021), ECF No. 16-6. The letter complained that Associate Provost Weeks never produced an investigation report regarding their prior letter to her and opined that Weeks's failure to produce a report was "a dangerous signal sent from Provost's office showing its stance and permissiveness over wrongdoings in academic integrity and fairness, and importantly, in the wake of correcting anti-Asian bias nationwide." *Id.* at 1. The letter noted that Song and Zhang "are Asian females" and accused Cordero of excluding them from the preliminary meeting about Swartzendruber. *Id.* The letter also complained Cordero "retaliated fiercely against Drs. Zhang

and Song, who raised legitimate questions about" Swartzendruber during the August 2020 tenure committee meeting. *Id.* As an example of Cordero's retaliation, the letter stated that Cordero did not reply to Song's questions about her March 2021 evaluation letter. *Id.* at 2. The letter also stated that Cordero was biased toward Swartzendruber and Shen, "two faculty members . . . that are close to him." *Id.* at 3.

The next month, in October 2021, Song, Zhang, and Huang sent another letter to Hu. The October 2021 letter purports to respond to an email Hu sent to Zhang on September 10, 2021. The letter accused the College of Public Health—specifically Davis and Cordero—of providing false information to the provost following the September 2020 letter. The letter included a timeline of the reports that Song, Zhang, and Huang made to the provost's office and the UGA Ombudsperson, and it complained that the provost did not take their reports seriously. The letter did not explicitly mention race or national origin discrimination, but it did reiterate the accusation that Cordero retaliated against "colleagues with different opinions" and "faculty members who raised legitimate questions." Defs.' Mot. Summ. J. Ex. I, Letter from X. Song *et al.* to J. Hu 1-2 (Oct. 11, 2021), ECF No. 16-7.

In December 2021, UGA's vice provost for academic affairs appointed an independent committee composed of faculty members from outside the College of Public Health to review the allegations

made by Song, Zhang, and Huang.  The three-person review committee was provided with the communications Song, Zhang, and Huang had sent regarding their concerns, as well as responses from the provost's office.  The review committee interviewed Cordero, Davis, Song, Zhang, and Huang, as well as several other faculty members, and they "explored the promotion and tenure process as well as the culture in the department."  Defs.' Mot. Summ. J. Ex. B-10, Epidemiology & Biostatistics Review 1, ECF No. 15-2.

In an undated report that was forwarded to Song, Zhang and Huang on February 18, 2022, the review committee reported that it had investigated the complainants' concerns about the Epidemiology and Biostatistics Department's promotion and tenure process, leadership, and culture.  The review committee concluded that the "views and concerns" of the complainants (Song, Zhang, and Huang) were "not representative of the [Department of Epidemiology and Biostatistics's] perspective."  *Id.*  The review committee noted that the Department's tone was "tense," with individuals who interacted with the complainants "feel[ing] they have been bullied."  *Id.*  The review committee found no "major issues" with the Swartzendruber promotion and tenure process and no "evidence of favoritism or lack of fairness."  *Id.* at 1-2.  Finally, the review committee stated that it "experienced behaviors during the interviews" that were consistent with descriptions of "disruptive behavior" they had been told about, including unnamed individuals

"blaming others for problems, becoming unusually upset over everyday situations, challenging and resisting authority," and "expressing entitlement and that rules do not apply." *Id.* at 3. The review committee's report does not reference complaints of race or national origin discrimination or complaints of retaliation.

Song, Zhang, and Huang responded to the review committee's report in a letter to Provost Hu and Vice Provost Rodrigues. Pl.'s Resp. to Defs.' Mot. Summ. J. Ex. 29, Response Letter (Undated), ECF No. 20-29. The response stated that the review committee's report was "obviously questionable," stated that the investigation process was "significantly influenced by" others in the Department and in the College of Public Health, challenged one of the review committee's factual findings, asked that the investigation be re-opened, and requested transfers to other departments for Song, Zhang, and Huang. *Id.* at 2-3. The response did not explicitly reference race or national origin discrimination. It did state that as a consequence of the review committee's report, Song, Zhang, and Huang faced "even severer retaliation," including disciplinary action against Zhang. *Id.* at 3.

On March 24, 2022, Song had her annual evaluation meeting with Cordero regarding 2021. Senior Associate Dean for Research and Faculty Affairs Timothy Heckman attended the meeting without explanation. Cordero rated Song as meeting expectations for

teaching and service, below expectations for scholarship, and meeting expectations with comments for improvement in overall performance. For 2016 to 2020, Cordero had rated Song as meeting expectations for scholarship, teaching, service, and overall performance. For 2021, though, Cordero stated that Song's scholarship was below expectations because although her level of publications met expectations, she did not have sufficient external funding for research. Cordero found that Song's external funding for 2021 totaled $45,811.50, that she had not "obtained external funding to support doctoral students and postdoctoral research fellows," and that her total research expenditures were "the lowest amount of all Full Professors in the department" for 2021, well below the median of $405,963 and the mean of $582,567. Defs.' Mot. Summ. J. Ex. B-17, 2021 Evaluation 3, ECF No. 15-3.

Song objected to the findings during the meeting and later in writing, arguing that Cordero had understated her external research funding by more than $24,000 and that she had contributed to supporting students in the department through "direct and indirect costs." Pl.'s Resp. to Defs.' Mot. Summ. J. Ex. 12, 2021 Evaluation Resp. (Undated), ECF No. 20-12. Song also noted that she discovered through "personal conversations" that her "external fund expenditure" for 2021 was "similar to another department faculty member's at the same rank." *Id.* Song did not point to evidence of the actual amount of the colleague's external funding

for 2021, and she admits that she did not know the "exact amount" of her colleague's external funding "because we never talk about exact amount." Song Dep. 86:22-88:1, ECF No. 17. Song also did not point to evidence regarding the other components of the colleague's scholarship rating, such as his publications. Cordero did not respond to Song's letter.

After the evaluation meeting, Heckman sent Cordero an email, copying Davis, stating that he was "deeply disturbed" by what he observed during the meeting, that Cordero "administered the evaluation in a very professional manner," and that Song reacted to the below expectations rating by yelling "belligerently" at Cordero. Defs.' Mot. Summ. J. Ex. A-2, Email from T. Heckman to J. Cordero 2 (Mar. 24, 2022), ECF No. 14-4. Heckman reported that he had "never seen a faculty member engage in such unprofessional behavior during an annual evaluation." *Id.* Shortly after receiving Heckman's email, Davis issued Song a letter of counseling which stated that Song's behavior during the annual review meeting was "inappropriate, unprofessional, and disrespectful" because she spoke to Cordero "with an angry tone, yelled at him for extended periods of time, and interrupted him multiple times." Defs.' Mot. Summ. J. Ex. B-19, Letter from M. Davis to X. Song (Mar. 24, 2022), ECF No. 15-4.

Nearly a year later, in February 2023, Cordero sent Song a written annual review for 2022. He again rated Song as meeting

expectations for teaching and service, below expectations for scholarship, and meeting expectations with comments for improvement in overall performance. Defs.' Mot. Summ. J. Ex. B-20, Mem. from J. Cordero to X. Song (Feb. 20, 2023), ECF No. 15-5. Cordero noted that Song's primary external funding from research was a National Science Foundation grant that she shared with Huang, that she had two "small grants," and that she had submitted "multiple grants . . . that were not funded." *Id.* at 3. Cordero stated that this level of grant funding was below expectations, citing the College of Health Promotion and Tenure Guidelines. *Id.* He encouraged Song to seek additional external funding. *Id.* at 5. Song responded to the review, questioning whether each criterion in the Promotion and Tenure Guidelines must be met each year and noting that although the grants she received were small, they were considered prestigious. Pl.'s Resp. to Defs.' Mot. Summ. J. Ex. 19, Letter from X. Song to J. Cordero (Feb. 28, 2023), ECF No. 20-19. Cordero did not respond to Song's letter.

In July 2023, Song filed a charge of discrimination with the Equal Employment Opportunity Commission. In her EEOC charge, Song stated that she had complained about racial discrimination and retaliation in 2021 and 2022 and later received negative performance reviews and a letter of counseling. She later filed this action. In August 2024, Cordero left his position as head of

the department, and Ye Shen became the new department head.  In March of 2025, the post-tenure review committee completed the year-5 post-tenure review for Song and concluded that Song met expectations for a tenured faculty member at UGA.[1]

DISCUSSION

## I.  Song's Discrimination Claims

Song asserts that Defendants discriminated against her because of her race and national origin.  To establish a Title VII race or national origin discrimination claim, Song must show that her employer subjected her to an adverse employment action "because of" her race or national origin, which she may do by demonstrating that her race or national origin "was a motivating factor" for the action.  42 U.S.C. § 2000e-2(a)(1) & (m).  For a § 1981 race discrimination claim, Song must demonstrate that she was subjected to an adverse employment action and that her race was the "but for" cause of the action.  *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 341 (2020).

Song argues that Defendants subjected her to the following discriminatory adverse employment actions: (1) lower pay than a white colleague and (2) lower performance ratings than white colleagues.  The Court assumes for purposes of this order that

---

[1] The parties' fact statements include facts about Song's "meets expectations" annual review for 2023, but Song does not appear to contend that the 2023 review was an adverse employment action, so the Court finds that these facts are immaterial.

12

these actions constitute "some harm respecting an identifiable term or condition of employment" and are thus adverse employment actions. *Muldrow v. City of St. Louis*, 601 U.S. 346, 355 (2024). To survive summary judgment, Song must present enough evidence to show causation—evidence that "creates a triable issue concerning the employer's discriminatory intent." *Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 946 (11th Cir. 2023) (quoting *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011)). There are several ways to show that an adverse employment action was motivated by discriminatory intent, including direct evidence, circumstantial evidence that satisfies the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and a "convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Tynes*, 88 F.4th at 946 (quoting *Smith*, 644 F.3d at 1327–28).

Here, Song did not present any direct evidence of race or national origin discrimination. She relies primarily on the *McDonnell Douglas* framework, which requires a plaintiff to show, "as a preliminary matter, not only that she is a member of a protected class, that she suffered an adverse employment action, and that she was qualified for the job in question, but also that she was treated less favorably than 'similarly situated' individuals outside her class." *Lewis v. City of Union City*, 918

F.3d 1213, 1224 (11th Cir. 2019) (en banc).  Song asserts she was paid less than Kevin Dobbin, a white associate professor.  Even if Song had pointed to evidence that she and Dobbin were "similarly situated in all material respects," *id.* at 1226, she did not point to admissible evidence of their respective salaries.  Song cites an exhibit that she describes as an "Institutional Salary Chart." Pl.'s Statement of Material Facts ¶¶ 6-10, ECF No. 20-1; Pl.'s Resp. to Defs.' Mot. Summ. J. Ex. 17, Institutional Salary Chart, ECF No. 20-17.  Defendants object to Exhibit 17 because Song did not point to any evidence to authenticate or explain it.  Under Federal Rule of Evidence 901(a), the proponent of evidence "must produce evidence sufficient to support a finding that the item is what the proponent claims it is."  Or, for records generated by an electronic system, the proponent may satisfy the authentication requirement by presenting an adequate certification as required by Federal Rule of Evidence 902(13).  Here, Song did not respond to Defendants' objection and did not point to any evidence regarding the origin, author, or accuracy of Exhibit 17.  Thus, the Court may not consider Exhibit 17.  Song pointed to no other admissible evidence that she was paid less than a similarly situated individual outside her protected class.  Accordingly, the Court finds that Song did not present enough evidence to create a genuine fact dispute on her pay discrimination claims, and Defendants are entitled to summary judgment on these claims.

Song also asserts that she was treated less favorably than three white colleagues with respect to her performance reviews. Song did not include any facts about these colleagues in her statement of material facts or her response to Defendants' statement of material facts. She did mention them in her response brief, asserting that three colleagues got positive performance reviews despite their failure to meet certain metrics. As evidentiary support for this assertion, Song cites her deposition testimony. *See* Pl.'s Resp. Br. 20, ECF No. 20 (citing Song Dep. 47:6-48:3, 48:4-10, ECF No. 17). That testimony simply states that John McCracken is a full professor of epidemiology, Song Dep. 47:6-48:3, and that Danielle Lambert and Jessica Knight are both assistant professors of epidemiology, *id.* 48:4-10. Song's citations to the record, though, do not establish that McCracken, Lambert, and Knight were similarly situated to Song in all material respects or that they were treated more favorably with respect to their performance reviews. Thus, Defendants are entitled to summary judgment on Song's discrimination claims based on allegedly disparate performance reviews.

In addition to her comparator arguments, Song summarily contends that she pointed to enough evidence to satisfy the "convincing mosaic" standard. Despite its "flowery language," the convincing mosaic analysis is "a stand-in for the Rule 56 summary judgment standard applied to employment discrimination." *Ismael*

*v. Roundtree*, No. 25-10604, 2025 WL 3492930, at *5 (11th Cir. Dec. 5, 2025).  "A 'convincing mosaic' of circumstantial evidence is simply enough evidence for a reasonable factfinder to infer intentional discrimination in an employment action—the ultimate inquiry in a discrimination lawsuit." *Tynes*, 88 F.4th at 946.  A plaintiff can show a convincing mosaic by presenting evidence of "(1) 'suspicious timing, ambiguous statements . . ., and other bits and pieces from which an inference of discriminatory intent might be drawn,' (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual." *Lewis v. City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2019) (quoting *Silverman v. Bd. of Educ.*, 637 F.3d 729, 734 (7th Cir. 2011), *overruled on other grounds by, Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016)).  Here, although Song argues that she has enough evidence to meet the "convincing mosaic" standard, she did not specify what evidence in the present record would allow a jury to infer that Defendants intentionally discriminated against Song because of her race or national origin. Song has the "burden to produce and identify evidence," to support her claims, and the Court is not required to "'scour the record' in search of" additional evidence.  *Black Box Royalties, Inc. v. Universal Music Publ'g, Inc.*, 839 F. App'x 346, 350 (11th Cir. 2020).  Song did not identify evidence to support her "convincing mosaic" argument, and the evidence she cited would not allow a

jury to infer that Defendants discriminated against her because of her race or national origin.  Thus, the convincing mosaic standard does not save Song's discrimination claims, and Defendants are entitled to summary judgment.

## II.  Song's Retaliation Claims

Song's remaining claims are for retaliation.  Both Title VII and § 1981 protect employees from retaliation for opposing unlawful discrimination.  Title VII prohibits an employer from retaliating against an employee "because [the employee] has opposed any practice" made unlawful by Title VII.  42 U.S.C. § 2000e-3(a).  Similarly, § 1981 prohibits an employer from retaliating against an employee because she complained of racial discrimination.  *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 445 (2008).  To establish a retaliation claim under Title VII or § 1981, Song must show "that she engaged in statutorily protected conduct; she suffered an adverse employment action; and a causal relation exists between the two events."  *Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1307 (11th Cir. 2023).

Here, Song contends that she engaged in activity protected under Title VII and § 1981 when she and two colleagues wrote a series of letters to UGA's administration to protest alleged preferential treatment of a white tenure candidate.  She asserts that Cordero and Davis subjected her to adverse employment actions because of the letters, including Cordero's "below expectations"

scholarship ratings for 2021 and 2022 and Davis's letter of counseling. The Court assumes for purposes of the present order that the performance reviews and letter of counseling were materially adverse actions that would support retaliation claims under Title VII and § 1981. The remaining questions are (1) whether the letters were protected activity under Title VII and § 1981 and (2) whether the activity was a but-for cause of any materially adverse actions.

To engage in protected activity, an employee must communicate her reasonable belief that the employer's conduct constitutes employment discrimination that is unlawful under Title VII or § 1981. It is not enough for an employee simply to complain about a supervisor's conduct; she must complain that the conduct was motivated by her race or national origin. *See, e.g.*, *Coutu v. Martin Cnty. Bd. of Cnty. Comm'rs*, 47 F.3d 1068, 1074 (11th Cir. 1995) (per curiam) ("Unfair treatment, absent discrimination based on race, sex, or national origin, is *not* an unlawful employment practice under Title VII.").

Song does not seriously argue that the first two letters—the September 24, 2020 letter to Weeks and the October 4, 2020 letter to Hu—were protected activity under Title VII and § 1981, and the Court finds that they were not. Neither letter identified its authors by name, and neither letter mentioned race, national origin, discrimination, or retaliation for complaints of race or

national origin discrimination. Accordingly, the two 2020 letters are not protected activity under Title VII or § 1981.

The third letter, to which Song did sign her name, focuses on Cordero's alleged abuses of power, the lack of investigation by the provost's office into the Swartzendruber tenure issue, and Cordero's alleged favoritism toward Shen and Swartzendruber. Defs.' Mot. Summ. J. Ex. H, Letter from X. Song *et al.* to J. Hu (Sep. 9, 2021), ECF No. 16-6. The letter does opine that Weeks's failure to produce a report was "a dangerous signal sent from Provost's office showing its stance and permissiveness over wrongdoings in academic integrity and fairness, and importantly, in the wake of correcting anti-Asian bias nationwide." *Id.* at 1. But nothing in the letter explains how the lack of a report from Weeks regarding the prior complaints—which did not mention race or national origin discrimination or retaliation for complaints of race or national origin discrimination—relates to anti-Asian bias.

The only part of the five-page letter that remotely connects race or national origin to an employment decision is the following sentence: "Drs. Zhang and Song, both are Asian females, were also excluded by Dr. Jose Cordero from attending the preliminary consideration meeting on [the Swartzendruber tenure] case." *Id.* It is a stretch to infer from this language that Song and Zhang were claiming that they were excluded from the meeting *because* they were Asian women. Moreover, it is not clear how their

19

exclusion from a preliminary meeting about another person's tenure decision would give rise to a good faith, objectively reasonable belief that Cordero unlawfully discriminated against them because of their race or national origin by treating them worse than non-Asian or non-Chinese employees with respect to the terms and conditions of their employment. *See Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1351 (11th Cir. 1999) (explaining that for activity to be protected under Title VII's opposition clause, the employee must have an objectively reasonable belief that her employer engaged in an employment practice made unlawful by Title VII). Accordingly, the Court doubts that the September 2021 letter to Hu is protected activity under Title VII and § 1981.

Even if the September 2021 letter was protected activity under Title VII and § 1981, Song must show a causal connection between the protected activity and the adverse employment action. To do that, she has to show that the relevant decisionmaker was aware of the protected conduct and that the protected conduct "was a but-for cause of the alleged adverse action." *Yelling v. St. Vincent's Health Sys.*, 82 F.4th 1329, 1338 (11th Cir. 2023) (per curiam) (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013)) (stating that both Title VII and § 1981 retaliation claims require "but for" causation). Thus, Song must prove that if she had not complained *of race or national origin discrimination*, she would not have suffered an adverse action.

There is no dispute that Cordero was the decisionmaker on the March 2022 and February 2023 performance reviews and Davis was the decisionmaker on the March 2022 letter of counseling. Song did not point to any evidence that Cordero or Davis was aware of the September 2021 letter. The letter is addressed to Hu, it does not indicate that it was copied to Cordero or Davis, and Song did not point to any evidence indicating that they received it. Thus, Song did not establish that the two decisionmakers were aware she engaged in protected activity, so the performance reviews and letter of counseling could not have been in retaliation for the September 2021 letter. Even if the Court were to accept Song's apparent assumption that Cordero and Davis somehow knew about the September 2021 letter, Song also did not point to any evidence that the letter was a but-for cause of any materially adverse action. A very close temporal proximity between a decisionmaker's knowledge of protected conduct and a materially adverse action may create a genuine fact dispute on causation, but "a three to four-month gap in proximity is too long to show causal connection" in the absence of other evidence of causation. *Ceus v. City of Tampa*, 803 F. App'x 235, 249 (11th Cir. 2020) (per curiam); *see also Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1278 (11th Cir. 2008) (finding evidence of a causal connection between an October 2001 EEOC charge and June 2002 termination because the plaintiff was fired "immediately after and because he" engaged in the

*additional protected activity* of refusing to sign an arbitration agreement that would have required him to arbitrate the pending EEOC charge). Here, all the adverse actions Song relies on occurred at least six months after Song sent the September 2021 letter to Hu, and Song did not point to other evidence of causation. For all of these reasons, Defendants are entitled to summary judgment on Plaintiff's retaliation claims.

CONCLUSION

As discussed above, the Court finds that Song did not establish a genuine fact dispute on any of her claims. The Court thus grants Defendants' summary judgment motion (ECF No. 14).

IT IS SO ORDERED, this 15th day of December, 2025.

S/Clay D. Land
CLAY D. LAND
U.S. DISTRICT COURT JUDGE
MIDDLE DISTRICT OF GEORGIA